**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **KAREN CARDEN WALSH, Trustee** ) | |
| **in Bankruptcy for the Estate of** ) | |
| **JEFFREY SCOTT KIRBY and** ) | |
| **ROBYN LOUISE KIRBY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 07-CV-568-PJC** |
| ) | |
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **Defendant.** ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On October 15, 2008, the parties consented to trial of this matter before a United States Magistrate Judge [Dkt. No. 29]. Accordingly, the matter came on for non-jury trial on May 11-14, 2009. The Court hereby makes the following Findings and Fact and Conclusions of Law.

**FINDINGS OF FACT**

**I**
*Background*

1.      At all times relevant hereto, Jeffrey Scott Kirby ("Kirby") was a resident of Jay, Delaware County, Oklahoma. The events and treatment complained of herein occurred within the Northern District of Oklahoma. Kirby brings this action under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, alleging that he received negligent medical care at the Claremore Indian Hospital ("CIH") where he underwent surgery in February 2005. [*Complaint*, ¶ 3, Dkt. No 2].

2.      At all times relevant hereto, CIH was owned and operated by Defendant United States.   Dr. Sam Horton was an employee of CIH acting within the scope of his employment.   [*Pretrial Order*, ¶ 1, Dkt. No. 69].

3.      On February 18, 2006, Jeffrey Scott Kirby and Robyn Louise Kirby filed a voluntary Petition for Relief under Chapter 7 of the U.S. Bankruptcy Code.   *In Re: Jeffrey Scott Kirby, et al.*, No. 06-10138-M, (Bankr. N.D. Okla.) (hereafter, "*Kirby.*") Karen Carden Walsh ("Walsh") was appointed Bankruptcy Trustee.   *Id.* (Plaintiff's Exhibit No. 6).

4.      On May 23, 2006, the U.S. Bankruptcy Court granted a discharge of both Jeffrey Scott Kirby and Robyn Louise Kirby.   [Discharge of Joint Debtors, (*Kirby*, Dkt. No. 27)]. A Final Report and Proposed distribution was filed on February 28, 2007, but withdrawn on March 9, 2007, due to the omission of Kirby's malpractice claim as an asset of the estate.   (*Kirby*, Dkt. Nos. 33 & 36).   Kirby filed an administrative tort claim on Feb. 14, 2007.   On April 26, 2007, Walsh asked the Bankruptcy Court to allow her to retain Edward Ash as counsel to pursue Kirby's malpractice claim.   (*Kirby*, Dkt. No. 37).

5.      Kirby and Walsh filed this lawsuit on October 5, 2007, under the FTCA.   The Court dismissed Kirby from the lawsuit on February 6, 2009, finding that Walsh "as the bankruptcy estate's representative is the real party in interest with exclusive standing to assert the negligence claim in this action."   [*Opinion and Order*, Dkt. No. 42].

**II**
*Kirby's Medical Treatment Before February 2005*

6.     On September 23, 2001, Kirby was seen at the Emergency Room of CIH complaining of abdominal pain.   At the time, Plaintiff was 35 years old and weighed 277 pounds.   Plaintiff complained of pain in the lower left abdominal quadrant.   He had a temperature of 101 degrees and an elevated white blood count.   Kirby was hospitalized for three days.   (Trial Testimony of Kirby, Tr. Vol. I, p. 95; Government Exhibit 1, p. 361). He was treated by Dr. Suphong Techathuvanan ("Dr. Tech") and diagnosed with "acute diverticulitis." (Trial Testimony of Jeffrey Kirby, Tr. Vol. I, pp. 51, 90; Government Exhibit 1, pp. 337; 339-341; 360-361; 368; 373; 375; 391; Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, pp. 189-190); Trial Testimony of Dr. Tech, Tr. Vol. II, pp. 384-386).   A computer tomography scan ("CT") was ordered and confirmed the diagnosis of acute diverticulitis.   (Government Exhibit 1, pp. 339; 341; Government Exhibit 5; Trial Testimony of Dr. Tech, Tr. Vol. II, p. 386).   Kirby was discharged from CIH on September 26, 2001.

7.     On August 25, 2002, Kirby was again admitted to CIH complaining of abdominal pain.   His age at the time of this admission was 36 years of age; his weight was 288 pounds. (Government's Exhibit 1, p. 23; Trial Testimony of Jeffrey Kirby, Tr. Vol. I, pp. 53, 90, 95; Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, pp. 191-194).   Kirby underwent an air contrast barium enema which showed the presence of scattered diverticula.   Kirby was

treated for acute diverticulitis on an outpatient basis.   (Government's Exhibit 1, pp. 23; 33; Government's Exhibit 8; Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, pp. 194-202).

8.      Dr. Louis Silverman, an expert witness for Kirby, agreed that the contrast barium enema study showed diffuse diverticulosis and "a multiplicity of diverticula scattered." (Trial Testimony of Dr. Louis Silverman, Tr. Vol. III, p. 324).   Dr. Silverman also agreed that at the time of the Plaintiff's admission on August 25, 2002, his medical records noted a history of diverticulitis.   (Trial Testimony of Dr. Louis Silverman, Tr. Vol. III, pp. 324-325).

9.      In April of 2004, Kirby reported to CIH for scheduled surgery to remove his gallbladder.   However, because Kirby was experiencing chest pains the surgery was not done.   Kirby was transferred to St. Francis Hospital in Tulsa for treatment of mild coronary artery disease.   (Government's Exhibit 1, pp. 251-257; 287; 323-325).

### III
### *Kirby's Admission to CIH on February 15, 2005*

10.     On February 15, 2005, Kirby returned to the CIH Emergency Room complaining of abdominal pain in the right upper quadrant and left lower quadrant.   (Government's Exhibit 1, pp. 47-50; 91; 185; Trial Testimony of Dr. Jeffrey Kirby, Tr. Vol. I, p. 57; Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, p. 204).   Plaintiff indicated that, he was again scheduled for gall bladder surgery, but could not tolerate his abdominal pain. (Government's Exhibit 1, p. 91; Trial Testimony of Jeffrey Kirby, Tr. Vol. I, p. 99).

4

11.     Dr. Horton, then CIH Chief of Surgery, admitted Kirby to the Hospital on February 15, 2005, with a diagnosis of acute cholecystitis (gallstones) and acute recurrent diverticulitis.  (Government's Exhibit 1, pp. 123-125; 185; Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, pp. 204-206).   At the time of admission, Kirby was 38 years old and weighed 302 pounds.  (Government's Exhibit 1, pp. 91; Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, pp. 204-206; Trial Testimony of Jeffrey Kirby, Tr. Vol. I, p. 96). Plaintiff was placed on antibiotics and given IV fluids with orders for nothing by mouth (NPO status).   His condition improved over several days.   (Government's Exhibit 1, pp. 47-50).

12.     A CT scan of Kirby's abdomen was performed.     Dr. Felino Pascual, the interpreting radiologist, found that "Within the proximal sigmoid colon there is evidence of wall thickening with perimesenteric inflammatory changes and diverticular outpouching." Dr. Pascual further reported:   "Sigmoid diverticulitis but with focality of the inflammatory changes and wall thickening cannot exclude the possibility of neoplasm.   Suggest colonoscopy for further evaluation."   The Radiologist's interpretive report also found the presence of sigmoid diverticulitis.  (Government's Exhibit 1, pp. 47-50; 123-125; 185; Government's Exhibit 6; Trial Testimony of Dr. Felino Pascual, Tr. Vol. II, pp. 368-369).

13.     At trial, Dr. Pascual testified that he suggested a colonoscopy as a precaution to check for cancer.   Dr. Pascual also testified that a referring physician is not required to follow such a recommendation in a radiology report.   (Dr. Horton did not order a colonoscopy.)   He testified that he found a small part of the sigmoid colon to be inflamed

5

and found the presence of diverticula on the sigmoid colon.   (Trial Testimony of Dr. Felino Pascual, Tr. Vol. II, pp. 368-369; 370-372; 374; 378).

14.    Dr. John Frame, the Government's expert witness, testified that the radiologist had suggested the colonoscopy to rule out the presence of cancer.   Dr. Frame also testified that there was nothing in the Plaintiff's medical history which indicated Dr. Horton should have been looking for cancer.   (Trial Testimony of Dr. John Frame, Tr. Vol. III, pp. 491-492).

15.    On February 21, 2005, Dr. Horton discussed with Kirby and his wife the benefits and risks of performing a colecytomy (surgical removal of a segment of the colon) and gall bladder removal in one surgery.   Dr. Horton secured Kirby's consent for both procedures. (Government's Exhibit 1, pp. 121-122; Trial Testimony of Jeffrey Kirby, Tr. Vol. I, pp. 59-61; 91; 105-108.   Dr. Horton, by way of a diagram, showed the Plaintiff and his wife, that although diverticula existed throughout the colon, his plan was to take only a portion of the sigmoid colon.   (Government's Exhibit 1, pp. 123-125; 185).

## IV
### *Kirby's Surgery on February 22, 2005 and Aftermath*

16.    Kirby's surgery was performed on February 22, 2005.   After removing the gall bladder, Dr. Horton removed most of the sigmoid colon, the descending colon, and part of the transverse colon.   Dr. Horton's operative report indicates that the diverticular disease went higher up the colon than expected.   Portions of the colon were removed and a primary anastomosis (where two portions of the intestinal tract are connected to each other) was

performed.  (Government Exhibit 1, pp. 47-50; 123-25; Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, pp. 164-165; 263-267).

17.    Dr. Horton, upon inspection of Kirby's bowel during the surgery, noted:  "The diverticular disease was more significant than we had really figured in the left colon, and so it was decided that a formal left colectomy and sigmoid colectomy would be performed." Dr. Horton found the transverse and the sigmoid colon "heavily burdened" with a "massive number of diverticula."  Further, Dr. Horton selected the point of anastomosis to optimize blood supply to the area.  (Government Exhibit 1, pp. 123-25; Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, pp. 164-165; Trial Testimony of Jeffrey Kirby, Vol. I, p. 108). Prior to Kirby's surgery, Dr. Horton had intended to remove only the sigmoid colon; however, during the operation he discovered he needed to remove more than originally indicated to the Kirbys.  *Id*.

18.    Dr. Tech assisted and was present for the surgery performed upon Kirby. (Government Exhibit 1, pp. 123-25; Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, p. 219).   Dr. Tech confirmed the findings of Dr. Horton, consulted with Dr. Horton regarding the best plan for treatment of Kirby, and concurred with Dr. Horton's decisions and actions. (Government Exhibit 1, pp. 123-25; Trial Testimony of Dr. Tech, Tr. Vol. III, pp. 387-388).

19.    Dr. Horton discussed Mr. Kirby's case with Dr. Tech during surgery, including the optimal point for the anastomosis and possible outcome of the surgery.  (Government Exhibit 1, pp. 123-25).

7

20.     Kirby's post-surgical recovery was somewhat slow, but he was discharged on March 2, 2005.   At that time, he was eating, stooling, and walking.   (Government Exhibit 1, pp. 47-49).   Kirby stooled twice on February 27 and twice on February 28, 2005. (Government Exhibit 1, pp. 217-219).

21.     On March 3, 2005, Kirby went to the emergency room of Grove General Hospital complaining of a sudden onset of pain in the right lower quadrant.   He was transferred to CIH and re-admitted.   A barium enema showed a leak in the area of the anastomosis. (Government Exhibit 1, pp. 123-25; Trial Testimony of Dr. Samuel Horton, Tr. Vol I, pp. 219-223; Trial Testimony of Jeffrey Kirby, Tr. Vol. I, pp. 63-67).

22.     The possibility of a leak was disclosed to the Kirby prior to the colon resection and is a known complication in colon resection surgeries.   (Trial Testimony of Jeffrey Kirby, Tr. Vol. I, p. 109; Trial Testimony of Robyn Kirby, Tr. Vol. I, pp. 138; 143-144; Trial Testimony of Dr. John Frame, Tr. Vol. III, p. 496).   Consent was obtained in order to surgically repair the anastomosis and create a temporary colostomy.   (Government Exhibit 2, pp. 633-34; 642-45; 655-57).

23.     The March 4, 2005, surgery was successful, but Kirby's post-operative course was complicated by prolonged ventilation, continued elevated temperature, and elevated white blood count.   (Government Exhibit 2, p. 521).

24.     On March 10, 2005, at the request of Kirby's family and with Dr. Horton's approval, Kirby was transferred to Hillcrest Medical Center in Tulsa where he was treated by Dr. Jimmy Giddens.   (Government Exhibit 2, pp. 461; 521; Trial Testimony of Jeffrey Kirby,

Tr. Vol. I, p. 69; Trial Testimony of Dr. Jimmy Giddens, Trial Tr., Vol. III, pp. 413-420; Government Exhibit 2, pp. 230-233; 317).

25.     Dr. Giddens testified at trial that at the time of admission to Hillcrest Kirby was suffering from peritonitis as a result of the anastomotic leak.  He said Kirby had an extensive past medical history including recurrent bouts of acute diverticulitis, and colicystitis.   (Trial Testimony of Dr. Jimmy Giddens, Tr. Vol. III, pp. 412-413). Following treatment, Kirby was released from Hillcrest on March 31, 2005.   (*Id.* p. 414). At that time Kirby had an extensive surgical wound packed with gauze.   (Plaintiff's Exhibit Nos. 7A-E).

26.     Kirby was operated on at Hillcrest in October 2005 to reverse the ileostomy he received in March 2005 at CIH.   At the same time, Dr. Giddens repaired a hernia.   (Trial Testimony of Dr. Jimmy Giddens, Vol. III, pp. 424-425).   Kirby had another hernia surgery in 2009.   (*Id.* p. 425).

27.     Dr. Giddens testified that he saw Kirby on an outpatient basis and that Kirby had resumed normal bowel movements and had never made any comments about him having a problem with his bowel movements.   Dr. Giddens testified that he would consider one bowel movement every two or three days or three bowel movements a day to be within a normal range and the complications which he treated the Kirby for were common complications associated with diverticular disease.   (Trial Tr., Vol. III, pp. 423; 439-440; 444).

As a result of his surgeries and medical condition, Kirby was unable to work full-time as before the February 2005 operation and his income dropped significantly in 2005.   (Plaintiff's Exhibit No. 4).

28.   The tissue removed as a result of Kirby's colon surgery at CIH were sent to the pathology lab for testing.   The pathology report did not indicate any cancer, a fact conceded by Plaintiff's expert witness.   (Trial Testimony of Dr. Louis Silverman, Tr. Vol. II, p. 312; 314; Government's Exhibit 1, pp. 123-125; 185; Government's Exhibit 6; Pathology results confirmed the presence of diverticula in every portion of the bowel which had been removed.   (Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, pp. 224-226).   The pathology report noted:   "Diverticulosis and chronic diverticulitis."   (Government Exhibit 1, p. 137; Government Exhibit 8).   The pathology report, prepared by Dr. Michel Medwar, M.D., of Tulsa Medical Laboratory, also noted in Part B., p. 1:   "Representative sections submitted in four blocks.   Section summary:   1-3 diverticula, 4 resected margins (blue dye), 5 one possible lymph node."   (Trial Stipulation of the Parties, ¶ 2, Dkt # 71; Government's Exhibit 1, pp. 135-137).   The parties stipulated at trial that this portion of the pathology report is not to be construed by either party to in any way suggest or imply that the Pathologist only saw three (3) diverticuli in the lab specimens which were tested.   *Id.*

## V
### *Plaintiff's Claims of Malpractice*

29.   At trial, Plaintiff's expert, Dr. Louis Silverman, identified two bases for Plaintiff's claims of malpractice:   First, that a colonoscopy was not performed before Kirby's colon

surgery.   Second, that acute diverticulitis was misdiagnosed.   (Trial Testimony of Dr. Louis Silverman, Vol. II, pp. 309-310).

30.      Dr. Silverman testified that the manner in which the anastomosis was performed, the discharge of Mr. Kirbyfrom CIH, the manner in which the March 3, 2005, leak was addressed, and the consent obtained from Kirby for both procedures were all within the standard of care.   (Trial Testimony of Dr. Louis Silverman, Tr. Vol. II, pp. 295-297).

31.   Dr. Silverman testified that his complaints that Kirby was not given enemas until clear before the colon surgery and Dr. Horton's use of silk sutures in the repair of the anastomotic leak did not breach the requisite standard of care.   (*Id.* p. 309).

### (a)   *Misdiagnosis of Acute Diverticulitis*

32.      Dr. Silverman admitted that Kirby had a history of recurrent abdominal pain and that at some time in the past Kirby had a bout of acute diverticulitis.   (Trial Testimony of Dr. Louis Silverman, Tr. Vol. II, pp. 283; 308-309).

33.      A diagnosis of chronic diverticulitis means that at some point a patient had acute diverticulitis.   (Trial Testimony of Dr. John Frame, Tr. Vol. III, p. 492; Trial Testimony of Dr. Louis Silverman, Tr. Vol. II, p. 314).

34.      When diverticulitis appears in a patient as young as Kirby, it is considered to be a more aggressive or virulent form of diverticulitis.   (Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, pp. 157-159; Trial Testimony of Dr. John R. Frame, Tr. Vol. III, p. 490).

35.      Recurrent, aggressive diverticulitis infections should be addressed due to a heightened concern of colon perforation.   (Trial Testimony of Dr. Samuel Horton, Tr. Vol.

11

I, pp. 157-159; 184; Trial Testimony of Dr. John Frame, Tr. Vol. III, pp. 488-489). However, surgery should be delayed until the acute diverticulitis has subsided and ample time has passed to clean the bowel.   (Trial Testimony of Dr. Samuel Horton, Tr. Vol. I, pp. 214-218; Trial Testimony of Dr. John Frame, Tr. Vol. III, p. 501).

36.     The presence of acute diverticulitis can be initially diagnosed on clinical grounds and confirmed by objective data, like an x-ray, whether it is a CT scan or a barium enema. From his review of the medical records, Dr. Frame found that the appropriate standard of medical care was applied in finding that Kirby suffered from acute diverticulitis in 2001 at age 35; that in 2002 he suffered from a mild case of diverticulitis at age 36 and a barium enema study showed the presence of diverticulosis coli; and in 2005 at age 38 he was suffering from acute diverticulitis.   (Trial Testimony of Dr. John Frame, Tr. Vol. III, pp. 470-471; 476-484; Government's Exhibit 1, pp. 23; 33; 91).

37.     Dr. Silverman testified that before he could make a diagnosis of acute diverticulitis, he would require a physical examination, pain in the left lower quadrant, an increase in white blood count, and either a confirming CT scan or a barium enema.   (Trial Testimony of Dr. Louis Silverman, Tr. Vol. II, pp. 314-316).   Dr. Silverman agreed that when Kirby was admitted to CIH in September 2001 that he had left lower quadrant pain, Kirby satisfied all of these requirements.   (*Id.*)   Dr. Silverman also accepted the results and findings of Plaintiff's barium enema study in 2002.   (*Id*. p. 328-329).   Dr. Silverman also testified that he believes Kirby experienced acute diverticulitis during his hospital admission on February 15, 2005, and had a confirming diagnosis.   However, Dr. Silverman stated that he

12

would not have performed a colon resection but would have treated the patient medically instead.   (*Id*. p. 331-332).

### *(b)   Failure to Perform Colonoscopy Before the February Surgery*

38.    Dr. Silverman testified that had Kirby received a colonoscopy at CIH before his surgery in February 2005, it would have shown that a colon resection was not necessary or desirable at that time.   (Trial Testimony of Dr. Louis Silverman, vol. II, p. 359).

39.    Acute diverticulitis is a contraindication to colonoscopy because the pressure associated with colonoscopy could cause a perforation of the bowel.   (Trial Testimony of Dr. Horton, Tr. Vol. II, pp. 243-244; Trial Testimony of Dr. Tech, Tr. Vol. II, pp. 388-389; Trial Testimony of Dr. Frame, Tr. Vol. III, pp. 486-487).

40.    Dr. Frame testified that the appropriate standard of care owed to Mr. Kirby called for an appropriate evaluation of Mr. Kirby's presenting symptoms, as well as the subsequent objective data gathered in evaluation of those symptoms, and then the careful, informed conduct of any intervention, in this case the surgical procedure carried out.   Dr. Horton considered the appropriate factors of Kirby's age in determining whether or not Kirby was eligible for an elective colon resection, the number of occurrences of acute diverticulitis, and the presence of confirming diagnoses of acute diverticulitis present in the medical records.   Dr. Frame noted that Dr. Horton checked for confirming diagnoses of acute diverticulitis.   He testified that the most common symptom of acute diverticulitis is left lower quadrant abdominal pain or pain in the suprapubic area of the abdomen.   (Trial Testimony of Dr. John Frame, Trial Tr., Vol. III, pp. 469-471).

41.     Dr. Frame testified that in his 25 years of medical practice there is a trend in the medical community toward earlier surgical removal of diverticulitis with patients younger than 50 because of the likelihood of a reoccurrence.   Developing diverticulosis when younger than 50 indicates that one is much more prone to develop diverticulitis and recurring diverticulitis.   The key problems presented by recurrent bouts of diverticulitis are bleeding, perforation and obstruction or blockage.   An elective resection avoids putting a patient in an emergency situation.   An emergency resection prohibits the opportunity to properly prep the patient for surgery which could in turn lead to more complications. (Trial Testimony of Dr. John Frame, Tr. Vol. III, pp. 473-475).

42.     Dr. Frame testified that upon his review of the medical records and the history of Jeffrey Kirby that the elective colon resection performed on Kirby by Dr. Horton in February 2005 proper given Kirby's recurring bouts of diverticulitis; that the evaluation prior to that surgery was appropriate and the preparation and conduct of the surgery was excellent.   He also testified that the repair or attention to the unfortunate leak experienced by Kirby was timely, correct and well done.   (Trial testimony of Dr. John Frame, Trial Tr., Vol. III, pp. 464-468; Government's Exhibit 7).

43.     Dr. Frame testified that Kirby's elective colon resection was necessary based upon his medical history.   A colonoscopy was not required in order for Dr. Horton to confirm his diagnosis of acute diverticulitis and Dr. Horton did not breach the standard of medical care owed to Kirby.   Colonoscopy is contraindicated by acute diverticulitis and is never ordered

14

during an acute case of diverticulitis.   (Trial Testimony of Dr. John Frame, Tr. Vol. III, pp. 483-484; 497-499).

44.     Dr. Frame testified that the confirmed diagnosis of acute diverticulitis in 2005, standing alone, would have been sufficient for Dr. Horton to perform an elective resection within the applicable medical standard of care in 2005.   (Trial Testimony of Dr. John Frame, Tr. Vol. III, pp. 488-489).

45.     Dr. Frame testified that in his practice, and under the general standard of care owed to a patient like Mr. Kirby, that he would require only one documented occurrence of acute diverticulitis before resorting to surgical removal of the colon.  (Trial Testimony of Dr. John Frame, Tr. Vol. III, p. 488).

46.     To the extent any Conclusion of Law is more properly designated as a Finding of Fact, it is adopted and incorporated herein.

## <u>CONCLUSIONS OF LAW</u>

1.     Plaintiff's claims arise under the Federal Tort Claims Act ("FTCA"), which allows money damages for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."   28 U.S.C. § 1346(b)(1).   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1346(b)(1).   The events that gave rise to Plaintiff's claims herein occurred in the Northern District of Oklahoma.   Accordingly, venue is proper pursuant to 28 U.S.C. § 1391(b)

2.     "The FTCA applies the law of the place where the alleged negligence occurred and makes the United States liable to the same extent as a private person under like circumstances." *Wark v. United States,* 269 F.3d 1185, 1187 (10th Cir. 2001).

3.     "State substantive law applies to suits brought against the United States under the FTCA." *Hill v. SmithKine Beecham Corp.,* 393 F.3d 1111, 1117 (10th Cir. 2004). Because the acts of alleged negligence at issue in this case were committed in Oklahoma, the Court applies Oklahoma substantive law.   *Wark*, 269 F.3d at 1187.

4.     In Oklahoma, a plaintiff claiming medical malpractice negligence must prove three elements:   (1) a duty owned by the defendant to protect plaintiff from injury, (2) a failure properly to exercise or perform that duty, and (3) an injury to plaintiff proximately caused by the defendant's breach of that duty.   *Roberson v. Waltner, Inc.,* 108 P.3d 567, 569, 2005 OK CIV APP 15, ¶ 5 (Okla. Ct. App. 2005).

5.     The elements of medical malpractice must ordinarily be established through expert medical testimony.   *Benson v. Tkach,* 30 P.3d 402, 404, 2001 OK CIV APP 100, ¶ 10 (Okla. Ct. App. 2001).   In fact, "in all but the extraordinary medical malpractice case, the plaintiff has the burden of producing expert testimony to support a *prima facie* case of negligence." *Roberson*, 108 P.3d at 569; *see also Persaud v. Doe*, 213 Fed. Appx. 740 (10th Cir. 2007) (citing *Roberson*).

6.     Where there is more than one medically accepted method of diagnosis or treatment, a physician has the right to use his best judgment in the selection of the diagnosis/treatment, after securing the informed consent of the patient, even though another medically accepted

16

method of diagnosis/treatment might have been more effective.   *Graham v. Keuchel*, 847 P.2d 342, 355 (Okla. 1993).

7.      The Plaintiff in this matter failed to show that the diagnosis and treatment of Kirby by Dr. Horton and the staff at CIH in February/March 2005, fell below the standard of care applicable to this case.   Consequently, Plaintiff has failed to establish negligence by Dr. Horton or the staff at CIH.

8.      Because the Plaintiff failed to establish any negligent conduct on the part of Dr. Horton or the staff at CIH, she has also failed to show that any such conduct was the cause of harm to Kirby.

9.      To the extent that any Finding of Fact is more properly submitted as a Conclusion of Law, it is adopted and incorporated herein.

DATED this 11th day of August 2009.

Paul J. Cleary
United States Magistrate Judge